**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-04124

SADIE ROHDY

Plaintiff,

v.

INNERBALANCE HEALTH CENTER, LLC,
INNERBALANCE PROPERTY MANAGEMENT LLC,
INNERBALANCE REAL ESTATE LLC, and,
JOSEPH EISELE,

Defendants.

---

~~SECOND~~THIRD AMENDED COMPLAINT AND JURY TRIAL DEMAND

---

Plaintiff Sadie Rohdy, by and through her attorney Allison Mahoney of ALM Law, LLC and Georgina Melbye of Kalamaya | Goscha, alleges as follows:

## INTRODUCTION

1. This case is about a woman who made the decision to get help for addiction and the treatment center that failed her.

2. Plaintiff sought help for addiction in the spring of 2024. Specifically, she wanted to recover from her addiction to benzodiazepines, opiates, and alcohol.

3. Although Plaintiff lives in Michigan, she was willing to travel out of state for a rehab facility that was a good fit. Plaintiff and her mother were hopeful when they found Defendant InnerBalance Health Center, LLC ("InnerBalance"), which touted itself as a "holistic" recovery center.

4. InnerBalance represented on its website; through its Clinical Director, Defendant Joseph Eisele; and in its program contract that it was lawfully regulated and certified by the State of Colorado. It also represented that it would provide a holistic treatment experience for Plaintiff.

5. Plaintiff relied upon these representations and traveled from Michigan to Colorado for InnerBalance's 28-day residential treatment program.

6. InnerBalance's representations, however, were misleading.

7. To start, InnerBalance lacked a required certification to operate a residential recovery residence and was, therefore, in violation of Colorado. law. In fact, during Plaintiff's stay, the State of Colorado warned InnerBalance in writing that InnerBalance was not certified to operate a recovery residence and that it needed to become certified immediately.

8. Further, ~~InnerBalance and Defendant Eisele~~one or more Defendants hired and then failed to supervise a violent criminal, Demetrius Graves, to work overnight shifts—alone—and Defendants granted him unfettered access to the InnerBalance properties and its residents. Graves created a dangerous condition on InnerBalance's properties.

9. During June and July 2024, Graves worked at properties leased and used by InnerBalance Health Center, LLC in connection with its recovery program, including 2665 Abarr Drive, Loveland, Colorado ("Cattail Creek"), which was owned by InnerBalance Property Management LLC, and ~~the~~ 1402 W. 28th Street in Loveland, Colorado ("1402 Building"), which was owned by InnerBalance Real Estate LLC. Graves worked overnight shifts at Cattail Creek and had access to the 1402 Building during the day.

~~9.~~10. Graves immediately set to work grooming and manipulating Plaintiff, who was particularly vulnerable during her recovery.

~~10.~~11. Graves repeatedly sexually abused Plaintiff at InnerBalance. He manipulated her and abused his power to exploit her vulnerabilities during a time where she should have been permitted to heal.

~~11.~~12. Graves exploited his unrestricted access to the InnerBalance properties to have sex with her whenever and wherever he pleased. He even took Plaintiff to his apartment on visitor's day to have sex with her.

~~12.~~13. By hiring a criminal with a known propensity for violence to work overnight shifts with vulnerable individuals recovering from addiction, and by failing to supervise him, especially given these risks, one or more Defendants breached their duty to Plaintiff.

~~13.~~14. And because InnerBalance was not lawfully certified, the State was not fully regulating or overseeing its residential program, meaning that there was no mechanism for residents or regulators to file a grievance about the abuse.

~~14.~~15. After she completed the residential program, Plaintiff, who was disoriented, and under Graves' control, left InnerBalance in an Uber and went straight to Graves' apartment, where he gave her alcohol and marijuana.

~~15.~~16. Over the following weeks, Plaintiff spiraled into a dangerous and chaotic cycle with Graves. The two drank heavily together, and Plaintiff spent thousands of dollars to stay in various hotels and Airbnb rentals with Graves. Additionally, Plaintiff's mother hired a professional to try to track Plaintiff down.

~~16.~~17. Plaintiff made the brave decision to seek help. She is now in a worse position than before, traumatized, and her mental health has deteriorated. Plus, she is now justifiably scared to check herself into another treatment facility.

~~17.~~18. Plaintiff brings this action to hold Defendants accountable for these harms.

## PARTIES

~~18.~~19. At all relevant times, Plaintiff Sadie Rohdy was a citizen of the State of Michigan.

~~19.~~20. At all relevant times, Defendant Joseph Eisele was a citizen of the State of Colorado.

~~20.~~21. At all relevant times, Defendant Eisele was the Clinical Director of Defendant InnerBalance Health Center, LLC ("InnerBalance Health Center" or "InnerBalance").

~~21.~~22. Defendant Eisele founded InnerBalance Health Center in 1998.[1]

~~22.~~23. InnerBalance operates out of several properties that are located in close proximity to one another, including an individual therapy and administrative building located at 1414 W 28th Street, Loveland, Colorado ("1414 Building"); sleeping accommodations for residents of InnerBalance at Cattail Creek Inn, which is located at 2665 Abarr Drive, Loveland, Colorado ~~("Cattail Creek")~~; and at least one other property located at 1402 W 28th Street, Loveland, Colorado, where InnerBalance residents had workout and group therapy sessions~~ ("1402 Building"~~).

~~23.~~24. InnerBalance Real Estate LLC owns the 1414 Building and the 1402 Building properties.

~~24.~~25. Defendant Eisele formed InnerBalance Real Estate LLC and is its registered agent and, upon information and belief, its owner.

~~25.~~26. InnerBalance Property Management LLC owns the Cattail Creek property.

[1] *See* https://innerbalancehealthcenter.com/meet-our-director-joe-eisele/ (last accessed Feb. 12, 2026).

~~26.~~27. Defendant Eisele formed InnerBalance Property Management LLC and is its registered agent and, upon information and belief, its owner.

28. During June and July 2024, InnerBalance Health Center, LLC leased Cattail Creek, located at 2665 Abarr Drive, Loveland, Colorado, from InnerBalance Property Management LLC.

29. During June and July 2024, InnerBalance Health Center, LLC leased the 1402 Building and 1414 Building from InnerBalance Real Estate LLC.

30. InnerBalance Health Center, LLC and InnerBalance Property Management LLC also entered into an Independent Contractor Services Agreement that was in effect during June and July 2024.

31. Under the Independent Contractor Services Agreement, InnerBalance Property Management LLC agreed to provide or coordinate non-clinical support services for InnerBalance Health Center, LLC, including lodging support, room accommodations, allocation of support staff, day staffing, overnight staffing, and other related support services.

32. The Independent Contractor Services Agreement further provides that InnerBalance Property Management LLC may use employees, subcontractors, managers, staffing providers, or other personnel to perform those services and remains responsible for coordinating the services.

33. During June and July 2024, Demetrius Graves was employed by InnerBalance Health Center, LLC, InnerBalance Property Management LLC, InnerBalance Real Estate LLC, and/or some combination of those entities. Plaintiff pleads Graves' employment by those entities in the alternative.

~~27.~~34. Defendant Eisele is responsible for the hiring, retention, and oversight of staff and ~~employees~~personnel at InnerBalance and the properties upon which it operates, including Demetrius Graves.[2]

~~28.~~35. As the Director of InnerBalance, Defendant Eisele is also responsible for ensuring InnerBalance is properly certified under Colorado and Federal law and that residents at InnerBalance are safe.

~~29.~~36. At all relevant times, Defendant InnerBalance Health Center, LLC, InnerBalance Real Estate LLC, and InnerBalance Property Management LLC were limited liability companies organized under the laws of the State of Colorado, with their principal place of business in the State of Colorado. At all relevant times, each of the member(s) of Defendant InnerBalance Health Center, LLC; InnerBalance Real Estate LLC; and InnerBalance Property Management LLC were citizens of the State of Colorado.

## JURISDICTION AND VENUE

~~30.~~37. This action is brought pursuant to 28 U.S.C. § 1332(a), diversity of citizenship, as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

~~31.~~38. Plaintiff also asserts state-law claims over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

~~32.~~39. Venue in this district is appropriate pursuant to 28 U.S.C. § 1391 as Defendants reside in this district, and venue is appropriate in any district in which a defendant resides.

[2] *See id.* (noting, "As Clinical Director of Inner Balance Joe brought together an experienced team of counselors, doctors, nurses, psychologists, and health & fitness experts to provide services . . . .").

Additionally, a substantial part of the events giving rise to the claim occurred in this judicial district.

## BACKGROUND ALLEGATIONS

~~33.~~40. In the spring of 2024, Plaintiff decided to seek treatment for her addiction to benzodiazepines, opiates, and alcohol.

~~34.~~41. Plaintiff chose InnerBalance, despite its distance from home, based on important representations InnerBalance and Defendant Eisele made about its residential recovery program.

~~35.~~42. Defendant Eisele spoke with Plaintiff prior to her signing the contract and assured her that InnerBalance was a high-end treatment center where she would receive holistic healing.

~~36.~~43. InnerBalance also represented on its website that it was a residential treatment center, "licensed by the State of Colorado."[3] Further, in the Residential Outpatient Program Agreement that Plaintiff signed upon her arrival, InnerBalance promised that its "treatment center and [ ] professional behaviors are overseen by the Colorado Department of Regulatory Agencies." (*See* signed June 3, 2024, Residential Outpatient Program Agreement (the "Residential Program Agreement," or the "Agreement"), attached hereto as Exhibit 1.)

~~37.~~44. The representations were misleading.

~~38.~~45. As of early 2020, if an addiction treatment facility wants to operate a residential recovery center (also known as a "sober living facility" or "sober home") in Colorado, it is required by law to become certified by the Colorado Association of Recovery Residences ("CARR").[4] *See*

---

[3] *See* https://innerbalancehealthcenter.com/25-frequently-asked-questions/ (last accessed July 23, 2025).

[4] In June 2025, Ohio Recovery Housing became CARR's fiscal agent and began providing operational and administrative support to CARR. CARR remains substantively the same—its "core elements," including, "quality standards, certification review process, fee structure, and complaint procedures" are all the same. This administrative

C.R.S. §27-80-129. The statute was amended in 2023 to state that a "certifying body" approved by the Behavioral Health Administration certifies Colorado recovery residences, among other revisions.

~~39.~~46. CARR oversees and regulates "recovery residences."[5] It ensures that recovery residences meet certain, minimum established standards and provide safe and healthy housing so individuals may achieve and sustain recovery.

~~40.~~47. It is against the law to operate a recovery residence without a CARR certification.

~~41.~~48. InnerBalance operated, at least in part, as a recovery residence. Plaintiff entered ~~its~~ InnerBalance's recovery program, which included lodging at Cattail Creek. InnerBalance is thus required by law—and was required at the time of Plaintiff's stay—~~to be certified by CARR~~to ensure Cattail Creek was CARR certified.

~~42.~~49. InnerBalance, InnerBalance Property Management, LLC, and Defendant Eisele owed Plaintiff a duty to obtain all licenses and credentials required under state and federal law, including a CARR certification. A reasonable recovery residence would ensure that it was certified to operate a recovery residence before offering a recovery residence program to potential or actual customers.

---

change happened a year after Plaintiff's stay at InnerBalance, but regardless, InnerBalance was (and is) legally required to be CARR-certified to operate a residential treatment facility. *See Joint Public Statement from Ohio Recovery Housing and CARR,* https://carrcolorado.org/wp-content/uploads/2025/07/ORHXCARR-Joint-Public-Statement-Final.pdf (accessed July 15th 2025).

[5] A "recovery residence," "sober living facility," or "sober home" means any premises, place, facility, or building that provides housing accommodation for individuals with a primary diagnosis of a substance use disorder that does all of the following: (1) is free from alcohol and non-prescribed or illicit drugs; (2) promotes independent living and life skill development; and (3) provides structured activities and recovery support services primarily intended to promote recovery from substance use disorders. *See* C.R.S. §27-80-129(1)(1).

43.50. InnerBalance, InnerBalance Property Management, LLC, and Defendant Eisele know about this legal requirement. But neither InnerBalance nor InnerBalance Property Management, LLC were was not properly CARR-certified during Plaintiff's stay.

44.51. The State of Colorado warned InnerBalance in writing that it was breaking the law. On June 26, 2024, while Plaintiff was in the 28-day residential program, a state employee issued a written warning to InnerBalance that it was not CARR-certified, and "because it [InnerBalance] is a recovery residence, CARR certification is required." The State's warning directed InnerBalance to become certified "ASAP."

45.52. InnerBalance promised Plaintiff that it was lawfully certified when in reality it was (and continued) operating an unregulated recovery residence.

46.53. While InnerBalance and Defendant Eisele had an independent common law duty to take reasonable steps to protect Plaintiff from abuse, had InnerBalance and Cattail Creek been CARR-certified at the time of Plaintiff's stay, CARR regulators would also have overseen InnerBalance to ensure its compliance with certain requirements.

47.54. For example, CARR would have required InnerBalance and InnerBalance Property Management to comply with all state and federal requirements, provide a drug and alcohol-free environment, and clearly identify the responsible person(s) in charge of the facility to all residents.[6]

[6] *See CARR Standards for Recovery Residences Respectfully Adopted by and Affiliated with the National Association of Recovery Residences "NARR,"* Version 1.0, https://leg.colorado.gov/sites/default/files/images/carr-official_standards-1-2018.pdf (Jan. 2018).

~~48.~~55. Additionally, CARR requires staff members to abide by a "code of ethics," or "code of conduct," which expressly prohibits staff from becoming romantically or sexually involved with residents.[7]

~~49.~~56. While Defendants had an independent duty to do so, CARR provides an additional layer of protection to ensure that "[s]taff [] maintain clear, professional boundaries with residents," and are prohibited from:

- Any personal or romantic relationships with residents;
- Behavior that could be perceived as favoritism or exploitation; and
- Engagement in dual relationships that blur professional lines, including financial transactions or favors."[8]

~~50.~~57. CARR would also have regulated InnerBalance and InnerBalance Property Management's hiring processes and policies, including background checks on staff. CARR-certified facilities must have policies on background checks for staff and should evaluate background check results based on certain criteria, including:

- The relevance of any criminal offenses to the job role;
- The time elapsed since the offense;
- Any rehabilitation or corrective actions taken by the candidate; and

---

[7] *See id.* at p. 3 (Organizational/Administrative Standard 1.3 (providing that all levels of sober living residences "and their staff" must "agree to the CARR code of ethics") ; *see also CARR Code of Ethics*, https://carrcolorado.org/wp-content/uploads/2023/05/CARR-Code-of-Ethics.pdf ("Staff shall never become romantically or sexually involved with a client or anyone in the recovery/sober living/program home they assist.").

[8] *See CARR Guidebook and Best Practices*, 2d Edition, Staff Documents, Staff and House Manager Code of Conduct, p. 83, https://carrcolorado.org/wp-content/uploads/2024/11/CARR-Guidebook-and-Best-Practices-2025.pdf ("Staff must maintain clear, professional boundaries with residents, avoiding: (a) Any personal or romantic relationships with residents. (b) Behavior that could be perceived as favoritism or exploitation. (c) Engagement in dual relationships that blur professional lines, including financial transactions or favors.").

- Patterns of behavior that suggest risk or unreliability.[9]

~~51.~~58. A facility's policy on background checks should also specify which offenses may disqualify a candidate, such as violent crimes, fraud, or drug-related offenses, particularly if they conflict with the responsibilities of working in a recovery setting.

~~52.~~59. In addition to background checks, CARR would also have overseen and regulated InnerBalance and InnerBalance Property Management's procedures and standards used to confirm the qualifications and credentials of potential employees. CARR reviews these policies and procedures for specific elements, including, for example, verification of a candidate's professional licenses, certifications, educational qualifications, and employment history, as well as reference checks "to gain insight into the applicant's character, work ethic, and suitability for the role."[10]

~~53.~~60. Without the necessary certification and regulatory oversight in place, ~~InnerBalance and Defendant Eisele instead~~one or more Defendants negligently hired a criminal with a history of violence towards women and children to work overnight shifts and gave him unrestricted access to InnerBalance's properties, including the Cattail Creek and 1402 Building properties, and its vulnerable residents. Graves worked most overnight shifts alone in Cattail Creek without any oversight, and he had access to the 1402 Building during the day at least one day each week

~~54.~~61. ~~InnerBalance and Defendant Eisele~~Defendants breached their duty to supervise Graves, and Defendants breached their duty to prevent the foreseeable harm of ~~a~~the known risk posed by ~~a dangerous employee like~~ Graves. Defendants' lack of supervision or intervention only emboldened Graves to take Plaintiff all over Cattail Creek, the 1402 Building, and even to his

[9] *See id.* at p. 77.

[10] *See id.* at p. 79.

apartment to have sex with her. Importantly, CARR also enables residents, regulators, staff members, and the general public to file complaints or grievances about a certified recovery residence. CARR is responsible for investigating complaints.

~~55.~~62. Thus, without a CARR certificate, InnerBalance was operating an unregulated recovery residence at Cattail Creek, absent oversight, and without a mechanism to allow the State to intervene when necessary.

~~56.~~63. Plaintiff should never have been at an unregulated recovery residence. But InnerBalance concealed the fact that it was neither properly certified nor regulated by the State, so Plaintiff entered its recovery program. There, she was repeatedly sexually abused by ~~InnerBalance's employee.~~Graves. She was utterly unprotected by Defendants, who also made sure she was left unprotected by the State.

~~57.~~64. Trusting that InnerBalance was a safe place where she could heal, Plaintiff purchased a flight to Colorado and enrolled in the 28-day residential recovery program.

~~58.~~65. Upon her June 3, 2024 arrival, Plaintiff entered into the Residential Program Agreement with InnerBalance. In addition to the representations described above, InnerBalance also promised, in exchange for Plaintiff paying $15,000, to provide Plaintiff with "private accommodation," "nutritional meals," a "comfortable atmosphere," as well as counseling, "biochemical repair," "relapse prevention," and "restoration and balance of energy and wellbeing. (*See* Exhibit 1.)

~~59.~~66. Plaintiff paid in full at the time of her arrival on June 3, 2024.

~~60.~~67. During her stay at InnerBalance, Plaintiff's bedroom was located inside Cattail Creek and her group therapy and workout sessions occurred in the 1402 Building.

~~61.~~68. Just a few days after Plaintiff arrived at InnerBalance, Demetrius Graves, ~~an~~who worked at InnerBalance and/or for one the LLCs that owned the properties upon which InnerBalance operates ~~employee~~, targeted Plaintiff and crossed professional boundaries with her. During his overnight and unsupervised shifts at Cattail Creek, Graves initiated contact with Plaintiff—engaging her in late-night, intimate conversations and sharing inappropriate, personal details about his family, relationships, and even other residents and staff members.

~~62.~~69. Graves groomed Plaintiff. He brought her gifts such as clothes, food, playing cards, candy, and caffeinated beverages.

~~63.~~70. Graves' contact with Plaintiff became physical soon after. He began hugging Plaintiff. A few days later, he convinced Plaintiff that she needed to be "stretched out." Graves told her he was a fitness instructor and could help her with any pain from her previous knee surgeries.

~~64.~~71. These stretching sessions occurred inside the 1402 Building.

~~65.~~72. June 2024 text messages between Graves and Plaintiff depict the sexual nature of these "stretch sessions." Graves took Plaintiff to a back room, turned off the lights, and began to touch Plaintiff sexually. He kissed her, groped her breasts, and touched her genitals. Graves engaged Plaintiff in these "stretch sessions" on at least three other occasions.

~~66.~~73. Graves began having sex with Plaintiff at Cattail Creek. Not long after the first stretch session, Graves began entering Plaintiff's bedroom to have sex with her. And because InnerBalance, InnerBalance Property Management, LLC, and Defendant Eisele entrusted Graves with keys to the entire Cattail Creek property during his overnight shifts, and permitted him to roam the property unsupervised, he took Plaintiff all over the building to have sex with her. As

graphic text messages reveal, Graves had sex with Plaintiff in her bedroom, the reiki room, the basement, and unoccupied bedrooms, among other places.

~~67.~~74. InnerBalance, InnerBalance Real Estate, LLC, and Defendant Eisele entrusted Graves with keys to the 1402 Building at least one day a week as well, and Graves had sex with Plaintiff during the day at the 1402 Building.

~~68.~~75. All the while Graves continued to groom Plaintiff, who was under the influence of drugs, and in one of the most vulnerable periods of her life. Graves exploited his position of power not only by sexually assaulting Plaintiff, but also, as text messages show, by overwhelming her with inappropriate personal attention and praise. He sent her daily text messages, including pictures of himself, and a barrage of intrusive messages, including, for example, asking her to describe her dream vacation, including what she would wear, and what her makeup would look like; sharing that his "dream vacation" would be with "the love of his life;" telling her, "I trust you too. I carry your note in my wallet. I carry your image in my mind. I carry your heart alongside mine." He also showered her with gifts, cooked her special meals, and slipped notes under her door at all hours. Graves went as far as giving Plaintiff his valuable belongings such as his passport and car keys to "anchor" their "relationship."

~~69.~~76. Graves abused his position of authority by manipulating Plaintiff to become emotionally reliant upon him during a time she should have been given the space, safety, and comfort to work on trusting herself and overcoming her struggles with addiction. He did all this to control Plaintiff and to continue to have sex with her.

~~70.~~77. Plaintiff was forced to stay silent about the abuse. Graves threatened Plaintiff that if anyone found out about them, his life would be ruined. Plaintiff observed Defendants granting

Graves unfettered access to the InnerBalance properties and  residents, so she did not see a way out.

~~71.~~78. Graves destroyed Plaintiff's chance to recover. He had her trapped in a sexual relationship, and no one at InnerBalance intervened to help her. She experienced panic attacks and severe anxiety with physical manifestations, including vomiting. Even with the Valium InnerBalance kept her on, Plaintiff suffered from insomnia, disorientation, and exhaustion as a result of the abuse. Plaintiff could not meaningfully participate in or focus during group sessions or other treatments. While at InnerBalance, her mental health grew worse by the day, and Defendant Eisele was aware of this.

~~72.~~79. Towards the end of her stay, Graves began manipulating Plaintiff into believing that she needed to stay with him once she was discharged from InnerBalance. To get her used to the idea, Graves picked Plaintiff up from InnerBalance on visiting day and took her to his apartment, where he had sex with her. Afterwards, he returned her to InnerBalance.

~~73.~~80. InnerBalance discharged Plaintiff on July 2, 2024.

~~74.~~81. Plaintiff left InnerBalance in an Uber and went to Graves' apartment, where she stayed overnight. Over the next two weeks, Plaintiff moved from rental to rental, with Graves regularly visiting her, sometimes staying with her, and continuing to have sex with her. During these weeks, Plaintiff drank heavily, and Plaintiff and Graves purchased alcohol together at times. Plaintiff spent thousands of dollars on rental properties as she continued to deteriorate.

~~75.~~82. Plaintiff's mother hired someone to try to locate her daughter in the hope of bringing her back to Michigan. As a result of the abuse she experienced at InnerBalance, Plaintiff

suffers from severe and permanent emotional distress, including PTSD, addiction, insomnia, hypervigilance, anxiety, and depression. PTSD constitutes a physical impairment of the brain.

~~76.~~83. And because ~~InnerBalance~~Defendants failed to protect Plaintiff from a dangerous employee, or intervene to help her, Plaintiff is now fearful to enter another recovery program.

**FORESEEABILITY AND INDUSTRY STANDARDS**

~~77.~~84. Addiction professionals are aware of their influential positions with respect to clients and do not exploit the trust and dependency of their clients.

~~78.~~85. Addiction professionals do not engage in any form of intimate relationship with any current or former client.

~~79.~~86. When an addiction recovery residence fails to conduct proper background checks or hires an employee with a criminal background, it is foreseeable that the safety of their current and former recovery residents is at risk.

~~80.~~87. If staff at addiction recovery residences are not properly trained to recognize the signs of abuse, handle complaints, and report incidents, it is foreseeable that an employee's misconduct towards a recovery resident will go unreported.

~~81.~~88. Addiction recovery residences that lack necessary security measures or policies create foreseeable dangers such as allowing unsupervised or unrestricted access to vulnerable recovery residents.

~~82.~~89. Many individuals in substance abuse treatment have pre-existing trauma, making them especially vulnerable to these risks. Many recovering individuals also may be reluctant to report abuse due to fear, shame, or the belief they won't be believed, which foreseeably perpetuates a cycle of abuse and stems from the recovery residence's failures and creation of these risks.

## PROXIMATE CAUSE AND DAMAGES

~~83.~~90. But for ~~Defendant InnerBalance and Eisele's~~Defendants' negligent hiring practices, Graves would not have been employed ~~at InnerBalance~~by one or more Defendants and permitted to access ~~InnerBalance's~~ Cattail Creek and 1402 Building properties.

~~84.~~91. Defendants' multiple failures created the opportunity to Graves to sexually assault Plaintiff.

~~85.~~92. The sexual assaults were a direct and foreseeable result of Defendants' negligent acts and omissions.

~~86.~~93. Plaintiff's injuries, damages, and losses were proximately caused by Defendant InnerBalance and Eisele's breach of duty to follow state certification regulations and Defendants' failure to provide a safe recovery center for addiction recovery residents.

## LEGAL CLAIMS[11]

### FIRST CLAIM FOR RELIEF
(Premises Liability – Against All Defendants)

~~87.~~94. Plaintiff incorporates by reference all of the previous allegations in this Complaint as if fully set forth herein.

~~88.~~95. Defendants InnerBalance, Eisele, and InnerBalance Property Management LLC, at all relevant times, were "landowners" of the Cattail Creek Building, as defined in C.R.S. §13-21-115(1) and were legally responsible for the conditions, activities, and circumstances on the property.

[11] Plaintiff brings claims for the abuse that occurred on InnerBalance's properties under Colorado's Premises Liability Act, and she asserts the remaining claims arising from on-property abuse in the alternative pursuant to Federal Rule of Civil Procedure 8. Plaintiff's off-property claims against Defendants ~~InnerBalance Health Center, LLC and Joseph Eisele~~ for negligent hiring, negligent training, and negligence are not pleaded in the alternative to her Premises Liability Act claim.

~~89.~~96. Defendants InnerBalance, Eisele, and InnerBalance Real Estate LLC, at all relevant times, were "landowners" of the 1402 Building, as defined in C.R.S. §13-21-115(1) and were legally responsible for the conditions, activities, and circumstances on the property. Plaintiff, at all relevant times, was an invitee of Defendants at the Cattail Creek and 1402 Building properties.

~~90.~~97. Defendants InnerBalance, Eisele, and InnerBalance Property Management LLC, at all relevant times, were responsible for the safety of the premises and the residents at InnerBalance's Cattail Creek property located at 2665 Abarr Drive, Loveland, Colorado.

~~91.~~98. Defendants InnerBalance, Eisele, and InnerBalance Real Estate LLC, at all relevant times, were responsible for the safety of the premises and the residents at InnerBalance's 1402 Building located at 1402 W 28th Street, Loveland, Colorado.

~~92.~~99. Defendants, at all relevant times, were responsible for the safety of the premises and the residents at InnerBalance's Cattail Creek and 1402 Building properties located at 2665 Abarr Drive, Loveland, Colorado, and 1402 W 28th Street, Loveland, Colorado, respectively.

~~93.~~100. Defendants knew or should have known that Graves created a dangerous condition for the individuals who received treatment at InnerBalance. Graves' activities on the Cattail Creek and 1402 Building properties, including his violent propensities and misconduct towards residents, created dangerous circumstances on those properties for Defendants' invitees.

~~94.~~101. Defendants knew of the dangers presented by Graves, including the fact that he had a criminal history within the last four years involving violence towards women and children, and thus, knew or should have known that Graves presented a danger to those receiving treatment at InnerBalance, including Plaintiff.

~~95.~~102. Defendants had a non-delegable duty to protect invitees from unsafe conditions, including sexual, physical, or verbal abuse on the premises.

~~96.~~103. Defendants breached their duty to use reasonable care to protect against a danger on the Cattail Creek and 1402 Building properties.

~~97.~~104. Defendants did nothing to protect individuals receiving treatment at InnerBalance, including Plaintiff, from the dangers presented by Graves.

~~98.~~105. Defendants also had a non-delegable duty to supervise ~~its employees, including~~ Graves. Specifically, Defendants had a duty to take reasonable steps to prevent the foreseeable harm of the known risk created by Graves' propensity for violence against women and children. Defendants also had a duty to warn residents, including Plaintiff, of Graves' potential for violence and to provide opportunities for residents to report his abuse.

~~99.~~106. Defendants breached their duty to supervise by failing to reasonably supervise Graves by failing to prevent Graves from acting on his violent and predatory propensities. Instead, Defendants granted Graves access to Cattail Creek and the 1402 Building, including Plaintiff's bedroom and other rooms throughout the properties, enabling him to carry out his sexual abuse of Plaintiff without any limitation or restriction on his behavior.

~~100.~~107. Additionally, the Defendant or Defendants ~~InnerBalance and Eisele~~responsible for hiring Graves had a duty to Plaintiff to exercise reasonable care in making ~~their~~that decision ~~to hire Graves~~. Specifically, because Graves was expected to have close contact with vulnerable individuals undergoing addiction treatment at InnerBalance, and because Graves' position required induced reliance and trust, Defendants had a duty to go beyond Graves' employment application and perform an independent inquiry into Graves' background.

~~101.~~108. Defendants breached their duty to use reasonable care to protect against the danger (Graves) on the Cattail Creek and 1402 Building properties.

~~102.~~109. Defendants breached their duty to conduct the requisite inquiry into Graves' violent background and history of abuse towards women and children.

~~103.~~110. Defendants further breached their duty to Plaintiff by placing ~~an employee with~~Graves, who had a violent past, in a position where he had unrestricted and unsupervised access to vulnerable residents during overnight and daytime shifts and failing to monitor ~~that employee.~~him.

~~104.~~111. Defendants created the dangerous condition by allowing Graves to work unsupervised during overnight shifts at Cattail Creek and daytime shifts at the 1402 Building. Specifically, Defendants created an undue risk of harm to those with whom Graves came in contact, including Plaintiff, in executing his employment responsibilities.

~~105.~~112. Sexual assault by an overnight worker at an addiction recovery center is a known and foreseeable risk under Colorado's standards and industry guidance applicable to recovery residences. The assaults were particularly foreseeable given Graves' criminal background, and the particular vulnerabilities of the residents seeking recovery at InnerBalance.

~~106.~~113. Defendants InnerBalance, InnerBalance Property Management, LLC, and Eisele also owed Plaintiff a duty to obtain all licenses and credentials required under state and federal law.

~~107.~~114. A reasonable recovery residence and a reasonable clinical director of a recovery residence would ensure that the facility obtained the required certifications to operate a recovery residence before offering a residential program to potential or actual clients.

~~108.~~115. Defendants InnerBalance, InncerBalance Property Management, LLC, and Eisele breached their duty to Plaintiff by negligently failing to obtain a CARR-certification and unlawfully operating a recovery residence without the necessary certifications.

~~109.~~116. Defendants' failure to address the known dangerous condition was the proximate cause of Plaintiff's injuries.

~~110.~~117. As a direct and proximate result of the dangerous conditions, activities, and circumstances on the premises, Plaintiff suffers from severe and permanent emotional distress, including PTSD, addiction, insomnia, hypervigilance, anxiety, and depression, as well as other economic and non-economic damages. PTSD constitutes a physical impairment of the brain.

~~111.~~118. Plaintiff demands all costs of suit and litigation, pre-filing interest, pre-judgment interest, and post-judgment interest.

**SECOND CLAIM FOR RELIEF**

(Negligent Hiring, Supervision, Training, and Retention – Against All Defendants ~~InnerBalance Health Center, LLC and Defendant Joseph Eisele~~)

~~112.~~119. Plaintiff incorporates by reference all of the previous allegations in this Complaint as if fully set forth herein.

~~113.~~120. Defendants had a duty to InnerBalance residents, including Plaintiff, to exercise reasonable care to ensure that their employees, agents, or independent contractors under their supervision or control, including Graves, were properly screened, trained, supervised, and retained to protect InnerBalance residents, including Plaintiff, from foreseeable harm, including sexual abuse.

~~114.~~121. Defendants knew or should have known that their failure to properly train and supervise ~~their~~ employees or other personnel under their supervision or control created an unreasonable risk of harm to residents, including Plaintiff.

~~115.~~122. Defendants failed to exercise a reasonable degree of care and breached their duties to Plaintiff by, including but not limited to:

a. Hiring Graves despite his violent, criminal past;

b. Allowing Graves unsupervised access to InnerBalance residents recovering from addiction during overnight shifts;

c. Failing to provide adequate training to staff, including Graves, regarding appropriate workplace behavior, including maintaining professional boundaries with residents—on and off InnerBalance's premises, recognizing and preventing grooming and predatory behavior, reporting suspected abuse or misconduct, and safeguarding the physical and emotional wellbeing of vulnerable current and former residents;

d. Failing to implement proper safeguards despite legal requirements to do so as a residential recovery center;

e. Failing to provide qualified and credible employees as represented to InnerBalance residents;

f. Failing to exercise reasonable care in evaluating and retaining Graves; and

g. Failing to provide direct supervision of personnel, including supervising Plaintiff and her interactions with Graves during Plaintiff's stay at InnerBalance

~~116.~~123. Defendants' negligent hiring practices directly enabled Graves to gain access to InnerBalance where he sexually abused Plaintiff.

~~117.~~124. Defendants' negligent hiring practices further enabled Graves to groom and develop a relationship with Plaintiff that extended beyond InnerBalance, resulting in continued sexual abuse off InnerBalance's premises and after Plaintiff was discharged.

~~118.~~125. Defendants' negligent hiring practices created an unreasonable risk of harm to Plaintiff both at InnerBalance and beyond it, during a visiting day and in the weeks following her discharge from the recovery residence.

~~119.~~126. Sexual assault by an overnight worker—including abuse that continues outside the recovery residence—is a foreseeable risk, particularly given Graves' criminal background, and the particular vulnerabilities of the residents seeking recovery at InnerBalance.

~~120.~~127. Defendants' negligent hiring practices violated applicable regulatory standards that apply to addiction recovery residences.

~~121.~~128. As a direct and proximate result of Defendants' breaches, Plaintiff suffers from severe and permanent emotional distress, including PTSD, addiction, insomnia, hypervigilance, anxiety, and depression, as well as other economic and non-economic damages.

~~122.~~129. Plaintiff demands all costs of suit and litigation, pre-filing interest, pre-judgment interest, and post-judgment interest.

**THIRD CLAIM FOR RELIEF**

**(**Negligence – Against Defendants InnerBalance Health Center, LLC and Joseph Eisele)

~~123.~~130. Plaintiff incorporates by reference all of the previous allegations in this Complaint as if fully set forth herein.

~~124.~~131. Defendants had a duty to protect Plaintiff arising out of a special relationship between Defendants and Plaintiff.

~~125.~~132. Defendants, by owning and operating a recovery residence and accepting Plaintiff as a resident, assumed responsibility for Plaintiff's care, safety, and wellbeing. Plaintiff, who was particularly vulnerable to abuse as a recovery resident working to recover from addiction, was subject to Defendants' policies and oversight and was dependent upon Defendants for safe

housing, support, and protection. Plaintiff, as a result, was deprived of her normal opportunities for protection as she depended upon Defendants for this protection.

~~126.~~<u>133.</u> Moreover, Defendants made explicit representations to Plaintiff, including in their contract with Plaintiff, including that they would provide Plaintiff a comfortable living atmosphere and that InnerBalance was overseen by the Colorado Department of Regulatory Agencies.

~~127.~~<u>134.</u> Because of this special relationship, Defendants owed Plaintiff an affirmative duty to exercise reasonable care to supervise and protect her from foreseeable harm, including sexual abuse by ~~Defendants' employee~~<u>Graves</u>.

~~128.~~<u>135.</u> Defendants failed to exercise a reasonable degree of care and breached their duties to Plaintiff in numerous ways, including, but not limited to:

a. Failing to implement appropriate hiring practices for sensitive environments;

b. ~~Hiring an employee with~~<u>Permitting Graves, who had</u> a violent criminal history<u>,</u> and directing ~~that employee~~<u>him</u> to work overnight shifts alone without any supervision or oversight;

c. Failing to provide adequate supervision of ~~employees~~<u>staff</u>, especially those like Graves working overnight shifts, and with unrestricted access to vulnerable recovery residents;

d. Failing to implement proper safety protocols and procedures;

e. Failing to maintain proper safeguards and statutorily mandated certifications for licensed recovery residences;

f. Failing to meet the standard of care for residential recovery centers treating vulnerable residents recovering from addiction;

g. Failing to properly train ~~employees~~<u>staff</u>, including Graves, regarding appropriate workplace behavior, including maintaining professional boundaries with residents—on and off InnerBalance's premises, recognizing and preventing grooming and predatory behavior, reporting suspected abuse or

misconduct, and safeguarding the physical and emotional wellbeing of vulnerable current and former residents; and

h. Failing to monitor employee performance conduct.

~~129.~~136. Defendants' conduct fell below the standard of care expected of residential recovery centers.

~~130.~~137. The sexual assaults on and off InnerBalance's properties were a foreseeable result of Defendants' negligent acts and omissions.

~~131.~~138. Sexual abuse by unsupervised staff in residential sett~~l~~ings is a known and foreseeable risk, especially in the context of addiction recovery residences, including abuse that occurs off premises where staff exploit relationships formed through their position of employment and authority over residents.

~~132.~~139. As a direct and proximate result of Defendants' negligence, Plaintiff suffers from severe and permanent emotional distress, including PTSD, addiction, insomnia, hypervigilance, anxiety, and depression, as well as other economic and non-economic damages.

~~133.~~140. Plaintiff demands all costs of suit and litigation, pre-filing interest, pre-judgment interest, and post-judgment interest.

**FOURTH CLAIM FOR RELIEF**

(Negligence – Against Defendants InnerBalance Real Estate LLC and InnerBalance Property Management LLC)

~~134.~~141. Plaintiff incorporates by reference all of the previous allegations in this Complaint as if fully set forth herein.

~~135.~~142. Defendants had a duty to protect Plaintiff arising out of a special relationship between Defendants and Plaintiff.

~~136.~~143. By providing the properties on which the recovery residence operated and/or housed residents, Defendants assumed responsibility for Plaintiff's care, safety, and wellbeing. Plaintiff, who was particularly vulnerable to abuse as a recovery resident working to recover from addiction, was subject to Defendants' policies and oversight and dependent upon Defendants for safe housing, support, and protection. As a result, Plaintiff was deprived of normal opportunities for self-protection because she relied on Defendants to provide that protection.

~~137.~~144. Because of this special relationship, Defendants owed Plaintiff an affirmative duty to exercise reasonable care to supervise and protect her from foreseeable harm, including sexual abuse by ~~InnerBalance's employee~~Graves, who had access to the Cattail Creek and 1402 Building properties.

~~138.~~145. Indeed, Plaintiff and other InnerBalance residents were housed at Cattail Creek and they received services, including workout and group therapy sessions, at the 1402 Building.

~~139.~~146. Defendants failed to exercise a reasonable degree of care and breached their duties to Plaintiff in numerous ways, including, but not limited to:

a. Permitting ~~an InnerBalance employee with~~Graves, who had a violent criminal history, access to the Cattail Creek property and directing ~~that employee~~him to work overnight shifts alone without any supervision or oversight;

b. Permitting ~~an InnerBalance employee with~~Graves, who had a violent criminal history, access to the 1402 Building property and directing ~~that employee~~him to work daytime shifts without appropriate supervision or oversight;

c. Failing to provide adequate supervision of ~~employees~~staff and personnel, especially those like Graves working overnight shifts, and with unrestricted access to vulnerable recovery residents;

d. Failing to implement proper safety protocols and procedures;

e. Failing to maintain proper safeguards and statutorily mandated certifications for licensed recovery residences;
d.

e. f. Failing to maintain proper safeguards for recovery residences and housing for recover residences;

g. Failing to meet the standard of care for residential recovery centers treating vulnerable residents recovering from addiction;

h. Failing to properly train staff, including Graves, regarding appropriate workplace behavior, including maintaining professional boundaries with residents—on and off InnerBalance's premises, recognizing and preventing grooming and predatory behavior, reporting suspected abuse or misconduct, and safeguarding the physical and emotional wellbeing of vulnerable current and former residents; and
f. i.

g. j. Failing to monitor employee performance conduct.

140. 147. Defendants' conduct fell below the standard of care expected of premises on which residential recovery centers operate.

141. 148. The sexual assaults Plaintiff experienced on InnerBalance's Cattail Creek and 1402 Building properties were a foreseeable result of Defendants' negligent acts and omissions.

142. 149. Sexual abuse by unsupervised staff in residential settlings is a known and foreseeable risk, especially in the context of addiction recovery residences.

143. 150. As a direct and proximate result of Defendants' negligence, Plaintiff suffers from severe and permanent emotional distress, including PTSD, addiction, insomnia, hypervigilance, anxiety, and depression, as well as other economic and non-economic damages.

144. 151. Plaintiff demands all costs of suit and litigation, pre-filing interest, pre-judgment interest, and post-judgment interest.

**FIFTH CLAIM FOR RELIEF**

(Vicarious Liability – Against All Defendants~~ InnerBalance Health Center, LLC and Defendant Joseph Eisele~~)

~~145.~~152. Plaintiff incorporates by reference all of the previous allegations in this Complaint as if fully set forth herein.

~~146.~~153. Defendants are responsible for the acts and omissions of their employees, agents, and representatives acting within the course and scope of their employment and/or agency.

~~147.~~154. ~~At~~Plaintiff alleges in the alternative that, at all relevant times, Demetrius Graves was an employee or agent of ~~Defendants.~~InnerBalance Health Center, LLC, InnerBalance Property Management LLC, InnerBalance Real Estate LLC, and/or some combination of those entities.

~~148.~~155. Graves was acting within the course and scope of his employment when he entered and occupied ~~InnerBalance's~~the Cattail Creek property during his overnight shifts and ~~InnerBalance's~~the 1402 Building during his daytime shifts, used his access privileges granted by Defendants, and interacted with residents, including Plaintiff.

~~149.~~156. Graves' misconduct occurred while performing assigned job functions and using authority and access conferred by Defendants.

~~150.~~157. Graves' ability to isolate, groom, and sexually exploit Plaintiff arose directly from his employment status and the position of trust Defendants gave him.

~~151.~~158. Defendants provided Graves with the means and opportunity to commit the assaults through ~~their~~his employment relationship with one or more Defendants, including granting him: unfettered after-hours access to all areas of~~ the~~ Cattail Creek; authority to interact

with and supervise residents during vulnerable nighttime hours; unsupervised access to the 1402 Building during the week; and access and apparent authority representing Defendants.

~~152.~~159. The employees, agents, and principals of ~~InnerBalance~~Defendants, including supervisors, managers, and directors, had an independent duty to remove dangerous or unqualified employees and protect residents from foreseeable criminal or abusive acts committed by staff.

~~153.~~160. Defendants' employees and agents breached those duties by ignoring and/or concealing Graves' misconduct and allowing Graves to remain in a position of authority despite knowledge or constructive knowledge of his violent tendencies and boundary violations.

~~154.~~161. At all relevant times, those employees, agents, and principals were acting within the scope of their authority when they failed to enforce industry-accepted policies and protocols and otherwise permitted the dangerous condition to persist.

~~155.~~162. As a direct and proximate result of these breaches and of Graves' tortious conduct for which Defendants are vicariously liable, Plaintiff suffers from severe and permanent emotional distress, including PTSD, addiction, insomnia, hypervigilance, anxiety, and depression, as well as other economic and non-economic damages.

~~156.~~163. InnerBalance is also liable because its own negligence or recklessness enabled Graves' assaults.

~~157.~~164. Plaintiff demands all costs of suit and litigation, pre-filing interest, pre-judgment interest, and post-judgment interest.

**SIXTH CLAIM FOR RELIEF**
(Breach of Contract – Against Defendant InnerBalance Health Center, LLC)

~~158.~~165. Plaintiff incorporates by reference all of the previous allegations in this Complaint as if fully set forth herein.

~~159.~~166. On June 3, 2024, Plaintiff executed the Residential Treatment Program Agreement with InnerBalance and agreed to pay $15,000 in exchange for holistic addiction treatment that included "private accommodation," "a comfortable atmosphere," counseling, "biochemical repair," "relapse prevention," and "restoration and balance of energy and wellbeing," among other treatments. (*See* Exhibit 1.)

~~160.~~167. In the Agreement, InnerBalance also notified Plaintiff of her "Rights and Responsibilities," notifying her that its "treatment center and [ ] professional behaviors are overseen by the Colorado Department of Regulatory Agencies." (*Id.*)

~~161.~~168. Plaintiff performed under the Agreement and paid for the promised services in full.

~~162.~~169. Defendant InnerBalance breached the Agreement by placing Plaintiff in a residential program that was not properly certified and, therefore, was not following certain required State regulations, in an environment that was dangerous and uncomfortable, and where Plaintiff was repeatedly sexually abused by a staff member with a violent criminal history.

~~163.~~170. Plaintiff was also an intended third-party beneficiary of statutory and regulatory safety obligations incorporated by law into the Agreement.

~~164.~~171. Graves' actions and InnerBalance's breaches of its contractual and legal duties allowed ~~InnerBalance's employee's~~Graves' abuse to occur and persist, and prevented Plaintiff from reaping the benefits of treatment by keeping her in a state of stress, anxiety,

exhaustion, and disorientation. No InnerBalance employee intervened to help Plaintiff or ensure she received the promised treatment.

~~165.~~172. As a result of InnerBalance's breach of contract, Plaintiff suffers from severe and permanent emotional distress, including PTSD, addiction, insomnia, hypervigilance, anxiety, and depression, as well as other economic and non-economic damages.

~~166.~~173. Plaintiff demands all costs of suit and litigation, pre-filing interest, pre-judgment interest, and post-judgment interest.

**SEVENTH CLAIM FOR RELIEF**

(Unjust Enrichment – Against Defendant InnerBalance Health Center, LLC)

~~167.~~174. Plaintiff incorporates by reference all of the previous allegations in this Complaint as if fully set forth herein.

~~168.~~175. Plaintiff conferred a benefit on Defendants InnerBalance and paid for holistic substance abuse treatment. This benefit was accepted and appreciated by InnerBalance.

~~169.~~176. InnerBalance was unjustly enriched for receiving payment at Plaintiff's expense, under circumstances that would make it unjust for Defendant InnerBalance to retain the benefit without the payment of its value.

~~170.~~177. Plaintiff suffered an unfair detriment as no unsuspecting and vulnerable client enrolled in a residential treatment program at InnerBalance and who pays for substance abuse treatment expects to experience sexual abuse, especially at the hands of ~~an employee.~~a staff members.

~~171.~~178. It is manifestly unfair to permit InnerBalance to retain the benefits received when Plaintiff suffers from severe and permanent emotional distress, including PTSD, addiction,

insomnia, hypervigilance, anxiety, and depression, as well as other economic and non-economic damages.

~~172.~~179. Plaintiff demands all costs of suit and litigation, pre-filing interest, pre-judgment interest, and post-judgment interest.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants and grant her the following relief:

A. Compensatory damages, including past and future economic damages and non-economic damages;

B. Attorneys' fees, as allowed by law;

C. All costs associated with this action, including, but not limited to, expert fees, deposition expenses, travel expenses, filing fees, and trial presentation expenses on all claims allowed by law;

D. Pre-filing, pre-judgment, and post-judgement interest at the highest lawful rate; and

E. Any other appropriate relief at law and equity that this Court deems just and proper.

**JURY DEMAND**

Plaintiff respectfully requests a jury trial on all triable issues.

**CERTIFICATION REGARDING USE OF ARTIFICIANT INTELLIGENCE**

The undersigned counsel certifies/certify that generative artificial intelligence was not used to draft this filing.

DATED: ~~May 22,~~[], 2026

**ALM Law, LLC**

*s/ ~~Allison Mahoney~~draft*
***Allison Mahoney (CO Bar No. 57677)***
411 East Main Street, Suite 205
Aspen, CO 81611
Telephone: (970) 315-5152
E-mail: allison@almlawllc.com

Kalamaya | Goscha

*s/ ~~Georgina Melbye~~draft*
***Georgina Melbye (CO Bar No. 47847)***
133 Prospector Rd #4102x
Aspen, CO 81611
Telephone: (970) 300-9215
Email: georgina@kalamaya.law

Attorneys for Plaintiff